| | |
|---|---|
| Douglas C. Olinger, | File No. 18-cv-00472 (ECT/TNL) |
| Plaintiff, | |
| v. | |
| Renville County Hospital & Clinics; and Nathan Blad, individually and in his capacity as CEO of Renville County Hospital & Clinics, | **OPINION AND ORDER** |
| Defendants. | |

Markus C. Yira, Yira Law Office, Ltd, Hutchinson, MN; and Julie W. Hanjani, Law Office of Julie Wacker Hanjani, Hutchinson, MN for Plaintiff Douglas C. Olinger.

Patrick J. Larkin and Michael T. Burke, Lind Jensen Sullivan & Peterson, PA, Minneapolis, MN for Defendants Renville County Hospital & Clinics and Nathan Blad.

Plaintiff Douglas Olinger alleges that Defendants Renville County Hospital & Clinics and its CEO, Nathan Blad, violated the Family and Medical Leave Act ("FMLA") by downgrading the duties of his position after he returned from an FMLA leave and by later terminating his employment for exercising his right to FMLA leave. Olinger also alleges that these same adverse actions violated Minnesota's Whistleblower Act because they occurred in retaliation for his exercise of reporting rights protected under the Act. Defendants have moved for summary judgment on all of Olinger's claims, and that motion will be granted. Olinger's FMLA entitlement claim based on the alleged downgrading of his position fails because, as a matter of law, the duties of his position when he returned

from FMLA leave were not sufficiently different from the duties of the position before his leave. Even if there were a legally sufficient difference, Defendants have shown that the changes to Olinger's duties would have occurred regardless of his FMLA leave. Olinger's FMLA discrimination claim based on his termination does not survive because Olinger has not identified evidence from which a juror reasonably could infer a causal connection between his exercise of FMLA rights and his termination. Olinger's claim under Minnesota's Whistleblower Act fails because he did not report a violation of the law—*i.e.*, he never blew the whistle—as the Act requires.

I[1]

Olinger began working for Renville County Hospital & Clinics (the "Hospital") in November 2000. Burke Decl., Ex. 1 ("Olinger Dep.") at 19 [ECF No. 38-1]; Compl. ¶ 9 [ECF No. 1]. He was employed initially as a maintenance engineer. Olinger Dep. at 31. From the day he started until about October 2007, Olinger reported to the Hospital's maintenance director, David Lofgren. *Id.* at 31–33. Lofgren retired at that time, and Olinger applied unsuccessfully for the director of maintenance position. *Id.* at 32–33. Olinger continued working as a maintenance engineer for several years, and in April 2014—with encouragement from the Hospital—Olinger accepted the position of housekeeping and laundry supervisor. *Id.* at 33–34. As the housekeeping and laundry supervisor, Olinger oversaw the staff of the housekeeping and laundry departments and

---

[1]    In describing the relevant facts and resolving this motion under Rule 56(a), all of Olinger's evidence is believed, and all justifiable inferences are drawn in his favor. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

reported to the Hospital's CFO. Burke Decl., Ex. 2 ("Position Description") at 1. Olinger's duties in this position included supervising staff and performing housekeeping work. *See generally id.* at 1–2. Olinger spent about fifty percent of his time on "office" or supervisory work and about fifty percent on the "floor" personally performing housekeeping duties. Olinger Dep. at 46–47.

Olinger requested and was granted FMLA leave on multiple occasions during his employment with the Hospital. In May 2014, shortly after beginning work as the housekeeping and laundry supervisor, Olinger requested and was granted FMLA leave to care for his son in connection with a surgery. *Id.* at 38. Olinger returned from this leave the following month, in June. *Id.* Olinger requested and was granted a second FMLA leave to care for his son beginning August 21, 2014. *Id.* at 39. He returned from this leave in mid-September. *Id.* at 39–40. At some point during October through December 2014, Olinger took a third FMLA leave to care for his son. *Id.* at 41–42. Olinger identifies no complaints with any of these three FMLA leaves. He acknowledges that these leave requests were approved with no issues and that he encountered no problems on his return to work from any of these leaves. *Id.* at 38–42.

Olinger twice applied for open maintenance engineer positions during 2015, but he was not successful on either occasion. In May 2015, Olinger applied and interviewed for the position, but another individual named Bruce Jacques was hired. *Id.* at 49–50; 73. Jacques subsequently was promoted to environmental services director. *Id.* at 73–74. His promotion created the second open maintenance engineer position for which Olinger applied; Olinger was scheduled to be interviewed for the position in September 2015. *Id.*

at 74–75.  Concerns with the Hospital's hiring process for these positions prompted Olinger to contact then-Renville County Administrator Sara Folstad prior to this interview.  *Id.* at 77–91.  Olinger asked Folstad what could be done "about the hiring process about - - if they were going to hire - - if they didn't hire the most qualified person."  *Id.* at 86.  Folstad told Olinger that he should follow the Hospital's grievance policy.  *Id.*  Olinger asked what he could do if he didn't "feel comfortable or if at this time I'm not sure if that's capable of going through that chain," and Folstad repeated that Olinger should follow the Hospital's grievance policy.  *Id.*  Olinger asked Folstad to keep their conversation confidential and said "if [he] thought something changed or it didn't look like it was above board, [he] would then follow up with her."  *Id.*  Olinger "never did have to call back and talk to her after that."  *Id.*  Olinger subsequently was interviewed for the open maintenance engineer position, but another individual was hired.  *Id.* at 74–75.

Olinger requested and was granted a fourth FMLA leave from September 29, 2015 until mid-February 2016 to undergo treatment for a neck condition.  *Id.* at 51–54.  Two events following Olinger's return from this leave form the basis for his FMLA claims in this case.  First, Olinger says that after he returned from this leave the duties of his position shifted away from being supervisory and that he "just became a floor worker."  *Id.* at 54.  Second, Olinger's employment was terminated on April 4, 2016.  Burke Decl., Ex. 8.  In a letter, the Hospital explained that Olinger was "being laid off from [his] position as Housekeeping Manager effective immediately."  *Id.*, Ex. 7.  The letter cited efficiencies gained from the Hospital's construction of and move to a "new building and anticipated

future cuts in reimbursements" as justifications for the layoff and described that the layoff was "indefinite in duration and should be considered permanent." *Id.*

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### A

#### 1

Olinger alleges that Defendants engaged in acts prohibited by the FMLA, and 29 U.S.C. § 2615(a) provides the basis for his claims. It reads:

> **(a) Interference with rights**
>
> **(1) Exercise of rights**
>
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> **(2) Discrimination**
>
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Our Eighth Circuit Court of Appeals "has recognized three types of claims arising under these two subsections. The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.* Though in several older cases the Eighth Circuit has described this claim as one for "interference" with FMLA rights, *e.g.*, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims." *Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005). The second type of claim is one for "retaliation." *Pulczinski*, 691 F.3d at 1005–06. A retaliation claim arises under § 2615(a)(2) and occurs when an employee opposes any practice made unlawful under the FMLA. *Id.* The third type of claim

> arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA. The textual basis for such a claim is not well developed in [the Eighth Circuit's] cases, but the claim likely arises under the rule of § 2615(a)(1) that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise"

rights defined by the FMLA. To distinguish the "entitlement" claim under § 2615(a)(1), and the "retaliation" claim under § 2615(a)(2), we think it helpful to describe this sort of complaint as a "discrimination" claim.

*Pulczinski*, 691 F.3d at 1006 (citations omitted); *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157–58 n.5 (8th Cir. 2016) (noting "unresolved difference of opinion" in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or (a)(2)). FMLA discrimination claims are evaluated "under the *McDonnell Douglas* burden-shifting framework that is applied in Title VII cases." *Pulczinski*, 691 F.3d at 1007.

## 2

Defendants, using the older FMLA nomenclature, argue that Olinger's claim challenging the post-leave downgrading of his position should be evaluated as a "retaliation" claim and not as one for "interference." *See* Mem. in Supp. at 13–22 [ECF No. 37]. Olinger pleads that Defendants violated his FMLA restoration right, and this aspect of Olinger's complaint must be analyzed as an entitlement claim under the Eighth Circuit's more recent decisions. Olinger alleges that he "was *entitled to restoration* to his position as described in the FMLA, 29 U.S.C. § 2614(1)," and that Defendants denied him this right. Compl. ¶ 26 (emphasis added). The allegations refer explicitly to the restoration right, cite the statute creating the right (albeit imperfectly—the correct cite is 29 U.S.C. § 2614(a)(1)), and plead facts—namely, that Olinger was denied this right because Defendants "demoted [him] to a more labor intensive position"—that, if proven, tend to show a violation of the right. *Id.* ¶¶ 22, 26. These allegations are sufficient to plead

a claim that Defendants violated Olinger's restoration right. Defendants argue that this aspect of Olinger's FMLA claim "confuses an interference claim with a retaliation claim." Reply Mem. at 4 [ECF No. 44]. Adhering to the Eighth Circuit's more recent and binding precedent, the question is whether Olinger's complaints regarding the downgrading of his position must be analyzed as an "entitlement" claim or a "discrimination" claim. The Eighth Circuit has made clear that an employee who alleges, as Olinger does here, that an employer violated his right "to be restored to the position [he] occupied before [he] took leave" asserts what used to be called an interference claim and what now is called an entitlement claim. *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005); *see also Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 907–08 (8th Cir. 2015) ("Brown's claim that Diversified denied her an equivalent position thus fits within the *Pulczinski* framework as a § 2615(a)(1) entitlement claim."). Olinger's claim that Defendants failed to restore him to his pre-leave housekeeping and laundry supervisor position, or its equivalent, must be analyzed as an entitlement claim.

"Upon return from FMLA leave, an employee is entitled to be restored to the same position held prior to the beginning of the leave, or its equivalent, in terms of benefits, pay and other terms and conditions." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)). "[T]he restoration of salary, title, and benefits does not necessarily constitute restoration to the same position within the meaning of section 2614(a)(1)(A) when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position." *Cooper v. Olin Corp.*, 246 F.3d 1083, 1091 (8th Cir. 2001). "An equivalent position is one

that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a); *see also* 29 C.F.R. § 825.215(e) ("An equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position."). "The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f). In the District of Minnesota, plaintiffs asserting FMLA restoration-entitlement claims have shown the existence of a genuine dispute as to a material fact to defeat a summary-judgment motion by citing evidence showing, for example, that they were assigned "substantially less" of the available work on return from leave than they had before taking leave or that the post-leave work is "very low-level" compared to pre-leave duties, *Johnson v. Campbell Mithun*, 401 F. Supp. 2d 964, 972 (D. Minn. 2005), or that changes "eliminated a significant portion of [their] previous job duties" or required performance of duties they "had not performed in many years," *Haskell v. CentraCare Health Sys.*, 952 F. Supp. 2d 838, 842 (D. Minn. 2013).

Olinger acknowledges that the position he occupied after returning from his September 2015-to-February 2016 FMLA leave had the same hours, salary, and benefits as the position he occupied before the leave. Olinger Dep. at 55–57. Regardless, he says that "major changes to his position occurred" that made the position he occupied after

returning "materially different" from the position he occupied before the leave.  Mem. in Opp'n at 13–14 [ECF No. 41].[2]  The housekeeping and laundry supervisor position Olinger occupied before his leave included supervisory duties (Olinger refers to these as "office" duties) and housekeeping duties (Olinger calls these "floor" duties).  Olinger Dep. at 46.  The supervisory duties included evaluating, planning, organizing, and controlling the activities and staff for the Hospital's housekeeping and laundry departments.  Position Description at 1–2.  Housekeeping duties "range[d] from cleaning patient rooms, hallways, exam rooms to the surgery area."  Olinger Dep. at 47.  Olinger testified that he split his time evenly between supervisory and housekeeping duties: "it was 50 percent floor, 50 percent office."  *Id.* at 46.  Olinger testified this split changed when he returned from his September 2015-to-February 2016 FMLA leave:

> Upon return, the duties of the position was different.  Wasn't a supervisor.  I didn't manage the staff.  I didn't put their schedules together.  I didn't implement the . . . policies or treatments or trainings or methods or any of that.  I just became a floor worker.

---

[2]    Olinger's position regarding whether he had the same title after returning from his leave is imprecise.  Olinger testified in his deposition that during a meeting with Lynette Bernardy, the Hospital's human resources director, and Jacques "a couple weeks before" he returned from leave he was assigned a new title, "floor manager."  Olinger Dep. at 54–55, 59–60, 63.  Though an email from Jacques to Olinger dated February 17, 2016 describes Olinger as a "Floor manager," it's not clear whether that is intended to reflect a title.  Yira Decl., Ex. 5 [ECF No. 42-5].  Finally, Olinger references the "floor manager" title in his opposition brief, Mem. in Opp'n at 4, but he does not seem to rely on a title change in arguing against summary judgment and, in fact, seems to acknowledge that, so far as the Hospital was concerned, he held the housekeeping supervisor title "upon his return."  *Id.* at 14.

*Id.* at 54; *see also id.* at 59 (testifying that, following return from leave, he no longer scheduled staff, managed timecards, implemented improvements and changes, or budgeted). Olinger testified that he became a "75 percent or almost a hundred percent floor person." *Id.* at 55.

Defendants argue that they did not violate Olinger's restoration rights because the position Olinger occupied on return from leave was not "outside of the core competencies" of the housekeeping and laundry supervisor position. Reply Mem. at 8. Defendants do not seem to dispute that Olinger's duties shifted at least somewhat and that he spent comparatively more of his time performing housekeeping work and less time on supervisory work after he returned from leave. However, the Hospital's human resources director, Lynette Bernardy, testified that Olinger retained responsibility to manage the housekeeping and laundry departments, and that this responsibility included conducting performance evaluations, ensuring compliance with Hospital policies, disciplining employees, and managing timecards. Burke Decl., Ex. 5 ("Bernardy Decl.") ¶¶ 5–6.[3]

---

[3]    The housekeeping and laundry supervisor position description says: "This job description is not intended to be all-inclusive. The employee will also perform other reasonable related duties as assigned by the supervisor or management. Management reserves the right to change job responsibilities, duties, and hours as needs prevail." Position Description at 4. Relying on these provisions, Defendants argue that Olinger's duties were not materially different after he returned from FMLA leave (and perhaps could not have been regardless of circumstances) because the Hospital "reserve[d] the right" to change Olinger's duties as it deemed necessary, and Olinger knew this. Mem. in Supp. at 17–18. This is not correct. An employer cannot bypass its employees' FMLA restoration rights by reserving in job descriptions the right to change employees' duties "as needs prevail." If that kind of reservation were sufficient, the Hospital, under its logic, could have reassigned Olinger to any number of very different positions—parking lot attendant, greeter, etc.—without consequence. That's not the law.

As a matter of law, Olinger has not shown that the duties of his housekeeping and laundry supervisor position were materially different during the not quite two months he worked after his September 2015-to-February 2016 FMLA leave from before he took this leave. As noted above, Olinger's title, hours, salary, and benefits all stayed the same. He was not required to perform new tasks. Housekeeping or "floor" duties were a significant part of Olinger's responsibilities before his leave. This is clear from the housekeeping and laundry supervisor position description. For example, it identifies the performance of "cleaning procedures" as a core competency, among others related to housekeeping duties. Position Description at 1. It lists several housekeeping tasks as "[g]eneral [r]esponsibilities." *Id.* These include, for example, maintaining the "cleanliness" of the Hospital and "[f]ollow[ing] established safety precautions when performing tasks and when using equipment and supplies." *Id.* The physical demands described for the position seem primarily to concern housekeeping duties. *Id.* at 2–4. As presented, the increase in housekeeping duties Olinger describes is de minimis as a matter of law under 29 C.F.R. § 825.215(f) because it is not the product of a useful measurement and is indefinite. Neither the position description nor any other document in the record establishes an expectation that Olinger's housekeeping (or supervisory) duties would be capped at fifty percent of his hours. Nothing reflects that Olinger recorded the actual time he spent performing each of these sets of tasks. Olinger does not say whether the even split he describes was a yearly average or a daily occurrence, so we do not know whether or how much the even split Olinger describes fluctuated during the year. Against this backdrop, Olinger's description of the position before his leave as involving an even split

between supervisory and housekeeping duties must be understood as an estimate, not a precise measure, of how he spent his time. If that is correct, then Olinger's description of the position after returning from his leave—that he performed housekeeping duties "75-100% of the time," Reply Mem. at 13, 14—is quite indefinite. In a 40-hour work week, Olinger's "75-100%" estimate represents a 10-hour swing one way or the other. And the fact that Olinger's post-leave estimate has a low end of "75%" is significant not only for its indefiniteness. Consistent with Bernardy's testimony, the 75 percent floor time in Olinger's estimate acknowledges, at least implicitly, that Olinger retained supervisory duties occupying up to roughly 25 percent of his time at points during the not quite two months he worked in the position following his return from leave. Especially given that Olinger's percentages should be understood as estimates, this reflects a roughly measured, insubstantial uptick in the amount of time Olinger spent on housekeeping duties. Finally, Olinger has not identified negative consequences that might follow from this change. He does not argue, for example, that it affected opportunities for career advancement or held any other tangible, adverse consequence.

Even if Olinger had shown the existence of a genuine issue of material fact regarding whether the duties of the housekeeping and laundry supervisor position were "materially different from those of the employee's pre-leave position," *Cooper*, 246 F.3d at 1091, the FMLA "does not impose strict liability on employers for interference [now entitlement] claims," *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012). If the employer can show that the employee's restoration rights would have been affected in the same way if the employee had not taken FMLA leave, then the employer cannot be liable under an

entitlement claim. *See id.* "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a).

Here, Defendants have shown that the changes Olinger describes to his housekeeping and laundry supervisor services position would have happened even if Olinger had not taken his September 2015-to-February 2016 FMLA leave. Scheduling is one of the primary supervisory or administrative duties Olinger says was not restored to him following his return from this leave. Olinger Dep. at 54. During Olinger's leave (or at least around the same time his leave began), the Hospital moved to a new building. Bernardy Decl. ¶ 2. As part of the move, the Hospital developed a new "block scheduling system" that remains in use today. *Id.* ¶ 3. The system "was implemented beginning on November 13, 2015," during Olinger's leave. *Id.* With the new scheduling system in place, "there was no longer a need for Mr. Olinger to work on a four-week rotation to schedule the housekeeping and laundry departments." *Id.* Budgeting is another of the principal administrative duties Olinger says was not restored following his leave. Olinger Dep. at 59. But Bernardy testified that the Hospital budget was last updated on December 18, 2015, which was the version approved by the board on December 23, 2015. Bernardy Decl. ¶ 7. Though Olinger does not seem to identify it specifically, managing the Hospital's telephone system was another of his pre-leave duties affected by the move. *Id.* ¶ 2. In its new facility, the Hospital installed a "Cisco phone system" that "was a much more sophisticated phone system that even [the Hospital's] IT department struggled with," prompting the Hospital to contract with an outside vendor to work with the IT department

14

to manage the system.  *Id.*  Olinger does not respond to this evidence.  He does not, for instance, explain why he would have retained scheduling authority despite the Hospital's implementation of the new block-scheduling system.  He does not suggest how he would have retained budgeting responsibilities following his return from leave in February 2016 when the Hospital approved the budget in December 2015.   It is true that Olinger identifies changes in his post-leave responsibilities, Mem. in Opp'n at 13, but even accepting the truth of those assertions and assuming they worked a material change to the duties of his position does not address Defendants' point that the duties of Olinger's position would have changed regardless of his FMLA leave.   For this reason, the law requires that summary judgment be entered against Olinger's FMLA entitlement claim.

### 3

Olinger alleges an FMLA discrimination claim based on Defendants' termination of his employment.  To establish a prima facie FMLA discrimination claim, Olinger must show that Defendants terminated his employment because Olinger exercised FMLA rights. *See Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013).   In the absence of direct evidence of discriminatory intent, an FMLA discrimination claim is analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4]   *See, e.g.*, *City of Jacksonville*, 711 F.3d at 891; *Diversified Distribution Sys.*, 801 F.3d at 908.  Under that framework, Olinger "must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse

---

[4]      Olinger does not claim to have direct evidence of discrimination.  *See generally* Mem. in Opp'n at 15–20.

employment action, and (3) that a causal connection existed between [his] action and the adverse employment action." *Diversified Distribution Sys.*, 801 F.3d at 908 (quotation omitted); *see also Pulczinski*, 691 F.3d at 1007. The burden of showing a prima facie case is "minimal." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quotation omitted). If Olinger satisfies that minimal hurdle, the burden then shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for their actions. *McDonnell Douglas*, 411 U.S. at 802. If Defendants meet this burden, then Olinger will have to demonstrate that Defendants' purportedly legitimate, nondiscriminatory reason was pretextual or discriminatory in its application. *Id.* at 807. Here, there is no dispute that Olinger engaged in protected activity when he took FMLA leave from September 2015 to February 2016. There also is no dispute that he suffered an adverse employment action when his employment was terminated.

The issue is whether Olinger has shown causality, and the record establishes that he has not. The Eighth Circuit "has said that an employee must prove that his exercise of FMLA rights 'played a part' in the employer's decision." *Pulczinski*, 691 F.3d at 1007 (citing *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n.3 (8th Cir. 2012) and 29 C.F.R. § 825.220(c)). Olinger's argument on this essential element of his claim is not clear. He argues that "Defendants [sic] conduct was motivated by retaliatory intent," Mem. in Opp'n at 19, but he does not cite particular evidence supporting this assertion. In a paragraph of his brief that seems intended to address a different issue—whether he suffered an adverse employment action—Olinger describes the testimony of two former coworkers, Fred Sorensen and LeeRoy Baumgartner, who say they heard Defendant Blad say that he

intended to "get rid of" Olinger. *Id.* at 17. Assuming it properly may be considered in opposition to Defendants' summary-judgment motion, this evidence does not show causality. Neither Sorensen nor Baumgartner's testimony permits an inference that Blad's statement was tied to Olinger's FMLA leave. The statement they describe is not tied explicitly to Olinger's exercise of FMLA rights; it does not mention the FMLA. In the abstract, there are many lawful reasons why an employer might want to "get rid of" an employee: poor performance, reorganization, budget cuts, adverse budget projections, etc. The issue is why Blad allegedly wanted to "get rid of" Olinger. In their depositions, Sorensen and Baumgartner attributed motives to Blad that clearly are not connected to Olinger's exercise of FMLA rights. Sorensen testified that he believed Blad's motive behind the statement was that "Mr. Olinger was good friends with a female employee" and "[t]hat was viewed by [Blad] as a problem." Yira Decl., Ex. 1 at 36–37 ("Sorensen Dep.") [ECF No. 42-1]. Baumgartner testified that he did not know why Blad wanted to "get rid of" Olinger, Yira Decl., Ex. 2 at 35 ("Baumgartner Dep.") [ECF No. 42-2], but that he understood from the first day he began working at the Hospital in October 2007 that Blad wanted to get rid of Olinger, *Id.* at 13, 43. Baumgartner acknowledged that Olinger continued to work for several years after Baumgartner began working at the Hospital but asserted that the Hospital "had no reason to fire him" during that time. *Id.* at 44. The timing of Blad's statement does not allow an inference that Blad's motivation in terminating Olinger's employment was his exercise of FMLA rights. To the extent Baumgartner testified that he understood from the time he was hired in 2007, Blad had wanted to get rid of Olinger, that desire predated Olinger's first FMLA leave by several

years, and his subsequent FMLA leaves by even longer. And insofar as Sorensen and Baumgartner testified that they heard Blad make this statement in a meeting "on or about July 17, 2015," two months before Olinger commenced his September 2015-to-February 2016 FMLA leave, Sorensen Dep. at 27–28; *see also* Baumgartner Dep. at 41, Olinger cites no evidence showing that Blad knew in July that Olinger would be taking FMLA leave beginning in September. Finally, the timing of Olinger's termination does not permit an inference of causality. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted). Temporal proximity alone may suffice only if it is "very close." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted). In determining the temporal relationship between the two events, the Eighth Circuit "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted). Without "something more," a gap of more than two months between the date the employer knew of the employee's planned use of FMLA leave and the adverse action "is too long" to show a causal connection between the two. *Id.* at 901 (citations omitted). Here, that gap is more than six months.

B

Minnesota's Whistleblower Act prohibits an employer from terminating an employee in retaliation for reporting a violation of the law. Minn. Stat. § 181.932, subd. 1(1). Absent any direct evidence of retaliation, courts apply the *McDonnell Douglas*

burden-shifting framework to analyze retaliation claims under the Whistleblower Act. *Hilt v. St. Jude Med. S.C., Inc.*, 687 F.3d 375, 378 (8th Cir. 2012) (citing *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001)). Thus, to make out a prima facie case for retaliation, Olinger must demonstrate first that he engaged in conduct protected by the Whistleblower Act, that is, he reported in good faith a violation or suspected violation of law. *See id.*; *Pedersen v. Bio-Med. Applications of Minn.*, 992 F. Supp. 2d 934, 939 (D. Minn. 2014), *aff'd*, 775 F.3d 1049 (8th Cir. 2015).

Olinger did not engage in conduct protected by the Minnesota Whistleblower Act because he did not "report[] a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law." Minn. Stat. § 181.932, subd. 1(1). The "report" on which Olinger grounds this claim occurred during his September 2015 telephone call with Renville County Administrator Folstad. To recap, during this call, Olinger asked Folstad what could be done "about the hiring process about - - if they were going to hire - - if they didn't hire the most qualified person." Olinger Dep. at 86. Folstad told Olinger that he should follow the Hospital's grievance policy. *Id.* Olinger asked what he could do if he didn't "feel comfortable or if at this time I'm not sure if that's capable of going through that chain," and Folstad repeated that Olinger should follow the Hospital's grievance policy. *Id.* Olinger admits he reported no violation or suspected violation of state or federal law during the call. *Id.* at 88. Olinger reported only his concern that the Hospital might not be hiring the most qualified person and that the Hospital might not hire him "for some other reason," though he admitted not knowing what that "other reason" might be. *Id.* at 86, 113–14. Olinger argues that his Whistleblower Act

claim warrants a trial because he reported a violation of the Hospital's hiring policies that, if true, would amount to a "common law breach-of-contract and/or breach-of-fiduciary duty," Mem. in Opp'n at 22. This argument lacks factual support. Olinger admitted in his deposition that he did not report to Folstad "that the [H]ospital was not following the stated employment procedure for their hiring process." *Id.* at 114. Even if Olinger said something like that to Folstad, this argument would lack legal support. Reporting the violation of an employer's internal policy generally is not sufficient to state a Whistleblower Act claim; to implicate a violation of law as required by the Whistleblower Act, the internal policy must have been adopted pursuant to law. *See Pedersen*, 992 F. Supp. 2d at 941; *Weigman v. Everest Inst.*, 957 F. Supp. 2d 1102, 1106 (D. Minn. 2013) ("Nor is it enough that such actions violated [the defendant's] internal policies." (citing *Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 22 (Minn. 2009))); *Salgy-Knapp v. Cirrus Design Corp.*, No. A03-654, 2004 WL 193140, at *3 (Minn. Ct. App. Feb. 3, 2004) ("[Plaintiff's] report did not implicate a violation of law, but rather merely implicated a violation of [the defendant's] internal policy . . . . Therefore, [plaintiff] has failed to establish an essential element of her whistleblower claim.") Here, Olinger does not explain how the Hospital's asserted failure to follow its hiring policies in a way that leads to the hiring of someone who is not "most qualified" breaches a contract or fiduciary duty. Olinger identifies no contract; he identifies no source of a fiduciary duty. And he identifies no law pursuant to which this aspect of the Hospital's hiring policies and practices were adopted.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED THAT**:

    1.       Defendants' motion for summary judgment [ECF No. 29] is **GRANTED**;

    2.       This action is **DISMISSED WITH PREJUDICE.**

          **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  November 12, 2019          s/ Eric C. Tostrud
                                    Eric C. Tostrud
                                    United States District Court